**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| YOUSEF ABUGHAZALEH, derivatively on behalf of VIRGIN GALACTIC HOLDINGS, INC., | |
| Plaintiff, | Civil Action No. 1:21-cv- |
| v. | **JURY TRIAL DEMANDED** |
| RICHARD BRANSON, WANDA AUSTIN, ADAM BAIN, MICHAEL COLGLAZIER, TINA JONAS, CRAIG KREEGER, EVAN LOVELL, GEORGE MATTSON, CHAMATH PALIHAPITIYA, JAMES RYANS, W. GILBERT WEST, and GEORGE WHITESIDES, | |
| Defendants, | |
| - and - | |
| VIRGIN GALATIC HOLDINGS, INC., | |
| Nominal Defendant. | |

<u>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**</u>

Plaintiff Yousef Abughazaleh ("Plaintiff") alleges, by and through his undersigned counsel, derivatively on behalf of Nominal Defendant Virgin Galactic Holdings, Inc. ("Virgin Galactic" or the "Company"), for this Verified Stockholder Derivative Complaint against Richard Branson, Wanda Austin, Adam Bain, Michael Colglazier, Tina Jonas, Craig Kreeger, Evan Lovell, George Mattson, Chamath Palihapitiya, James Ryans, W. Gilbert West, and George Whitesides (the "Defendants"), the following upon knowledge as to himself and his own actions, and upon information and belief as to all other matters, based upon his counsel's review of publicly available information, including Virgin Galactic's filings with the U.S. Securities and Exchange Commission ("SEC"), press releases, news articles, analyst reports, publicly available filings in lawsuits and other matters of public record.

## I.     INTRODUCTION

1.     This is a derivative action on behalf of Virgin Galactic, an aerospace company, against its officers and directors who caused the Company to misrepresent and conceal significant mishaps and setbacks during test flights, which called into question the near-term prospects of the Company.

2.     The Defendants concealed this information in order to enter the public markets, make multiple subsequent public and private raises thereafter, and, as to some Defendants, sell hundreds of millions of dollars of Virgin Galactic shares before the Company's challenges were publicized.

3.     Eventually journalists would reveal the extent of the safety, regulatory and operational problems behind the scenes at the Company, and the Company's stock price has declined significantly, subjecting it to class action securities litigation, and further harming its reputation and potential prospects.

4.     This action seeks to recover damages from the Defendants as a result of their breaches of their fiduciary duty, federal securities laws, and the common law.

## II.     JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action asserts claims under Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78aa, and SEC Rule 14a-9, 17 C.F.R. § 240.14a-9.

6.     This Court has supplemental jurisdiction over Plaintiffs state law claims pursuant to 28 U.S.C. § 1367(a).

7.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. §1332 because Plaintiffs and Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.

8.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

9.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

### III.    PARTIES

10.     Plaintiff Yousef Abughazaleh has continuously held Virgin Galactic stock during all relevant times set forth below. Plaintiff is a citizen of Nevada.

11.     Virgin Galactic is a Delaware corporation with its principal executive offices in Las Cruces, New Mexico. It is an aerospace company founded by Branson. Virgin Galactic's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "SPCE." It entered the public markets in October 2019 through a merger with Social Capital Hedosophia Holdings Corp. ("Social Capital"), a special purpose acquisition company ("SPAC") (the "Merger").

12.     Richard Branson ("Branson") is Virgin Galactic's founder, controlling stockholder, and the owner of the "Virgin" brand. Branson may be deemed to have indirect beneficial ownership of the shares of the Virgin brand companies through his ownership of Virgin Group Holdings, Inc. ("VGH"), which provides him with the ability to control the decisions of VGH regarding the voting and disposition of securities and to appoint and remove the management of VGH. Branson, therefore, controls VGH's subsidiaries through his control of VGH. When Virgin Galactic became a publicly traded company, Branson controlled nearly 59% of Virgin Galactic's common stock through VGH and its subsidiaries. Vieco 10 Limited ("Vieco") held all of Branson's Virgin Galactic stock until late July 2020, when Vieco's majority owner, Virgin Investments Limited ("VIL") took over holding and selling such shares. VIL's sole shareholder is Virgin Group

3

Investments LLC, whose sole managing member is Corvina Holdings Limited, which is owned by VGH. At all times, Branson was the Company's controlling stockholder, and through VIL currently owns nearly 12% of the Company's stock despite selling nearly $1 billion worth of stock since the Company went public in October 2019. Branson participated directly in the Merger negotiations with Palihapitiya and others representing Social Capital. Branson controlled Virgin Galactic and, under a Stockholders' Agreement that was executed in connection with the Merger (the "Stockholders' Agreement"), Branson and Palihapitiya hand-picked loyalists to serve on the Board. Since the Company's inception, Branson has been the public face of Virgin Galactic's commercial spaceflight venture. Branson is a citizen of the British Virgin Islands.

13.     Chamath Palihapitiya ("Palihapitiya") was Chairman and CEO of Social Capital until the Merger. Under the terms of the Merger Agreement, Palihapitiya became Virgin Galactic's Board Chairman and served in that capacity from October 2019 until February 17, 2022. Together with Branson and by virtue of the Stockholders' Agreement, Palihapitiya controlled the business and affairs of Virgin Galactic and the Board.

14.     Wanda Austin ("Austin") has served as a director since the Merger in October 2019. Branson and Palihapitiya, who controlled the Board, designated Austin as an appointee to the Board at the time of the Merger. As an initial eligible director, Austin received $125,000 plus a restricted stock unit award of $300,000. Austin is a member of the Audit and Safety Committees. Austin is a citizen of California.

15.     Adam Bain ("Bain") has been a director since the Merger in October 2019. Prior to the Merger, since September 2017, Bain served as a director of Social Capital. In connection with the Merger, Bain received a grant of 1,200,000 in restricted stock units which vested upon closing and certain other conditions. Branson, who with Palihapitiya controlled the Board, designated Bain

as an appointee to the Board at the time of the Merger pursuant to the Stockholders' Agreement. As an initial eligible director, Bain received $125,000 plus a restricted stock unit award of $300,000 when he became a director. Bain, as a sponsor, signed the Sponsor Support Agreement along with Palihapitiya and the other sponsors of Social Capital. Bain was one of the principal negotiators for Social Capital in connection with the Merger and the Company's Executive Compensation Plan and signed the Merger Agreement on behalf of Social Capital. Due to their long-standing professional and financial connections, including their roles at Social Capital, Bain is closely tied to Palihapitiya. Bain is a citizen of California.

16.    Craig Kreeger ("Kreeger") has been a director since the Merger in October 2019. Prior to becoming a director of Virgin Galactic, Kreeger was the CEO of Virgin Atlantic, one of Branson's other privately held ventures. Branson, who with Palihapitiya controlled the Board, designated Kreeger as an appointee to the Board at the time of the Merger pursuant to the Stockholders' Agreement. As an initial eligible director, Kreeger received $125,000 plus a restricted stock unit award of $300,000. Kreeger is the Chairperson of the Safety Committee, and a member of the Audit Committee. Kreeger is a citizen of California.

17.    Evan Lovell ("Lovell") has served as a director since the Merger in October 2019. Lovell is a close associate of Branson's and a partner since October 2012 at Virgin Group Holdings Ltd., which is controlled by Branson. Lovell has held and continues to hold a number of director positions for Virgin Group portfolio companies controlled by Branson. Prior to the Merger, Lovell served as Virgin's Chief Investment Officer. Branson, who with Palihapitiya controlled the Board, designated Lovell as an appointee to the Board at the time of the Merger pursuant to the Stockholders' Agreement. As an initial eligible director Lovell received $125,000 plus a restricted stock unit award of $300,000. Lovell is a member of the Safety Committee and is currently serving

as Interim Chairperson of the Board. Lovell was one of the principal negotiators for Virgin Galactic in connection with the Merger. Due to their extensive professional and financial connections through Virgin Group's portfolio of companies, including their roles at Virgin Galactic, Lovell is closely tied to Branson. Lovell is a citizen of Vermont.

18.     George Mattson ("Mattson") has been a director since the Merger in October 2019. Branson, who with Palihapitiya controlled the Board, designated Mattson as an appointee to the Board at the time of the Merger pursuant to the Stockholders Agreement. As an initial eligible director Mattson received $125,000 plus a restricted stock unit award of $300,000. Mattson is a citizen of Florida.

19.     James Ryans ("Ryans") served as a director from the Merger in October 2019 until he stepped down in February 2021. Prior to the Merger, since 2018, Ryans served as a director of Social Capital. In connection with the Merger, Ryans received a grant of 100,000 restricted stock units which vested upon closing and certain other conditions. Palihapitiya, who with Branson controlled the Board, designated Ryans as an appointee to the Board at the time of the Merger pursuant to the Stockholders' Agreement. As an initial eligible director, Ryans received $125,000 plus a restricted stock unit award of $300,000. Ryans, as a sponsor, signed the Sponsor Support Agreement along with Palihapitiya and the other sponsors of Social Capital. While on Virgin Galactic's Board, Ryans was a member of the Audit Committee. Ryans is a citizen of California.

20.     Michael Colglazier ("Colglazier") has been CEO and a member of the Board since July 2020. Colglazier is a citizen of California.

21.     Tina Jonas ("Jonas") has been a member of the Board since June 2021, and is a member of the Audit Committee. Jonas is a citizen of Virginia.

22.     W. Gilbert West ("West") has been a member of the Board since February 2021, and is a member of the Safety Committee. West is a citizen of Florida.

23.     George Whitesides ("Whitesides") was a member of the Virgin Galactic's management since 2010 and served as Virgin Galactic's CEO before and after the Merger. Branson and Palihapitiya designated Whitesides as a Board member and CEO at the time of the Merger. Whitesides served as the Company's CEO and a director from October 2019 until July 2020. Whitesides also served as the Company's Chief Space Officer from July 2020 until February 2021, when he left Virgin Galactic. Whitesides was one of the principal negotiators for Virgin Galactic in connection with the Merger and executed the Merger Agreement on behalf of the Company and related Virgin entities. Whitesides was due to receive stock options covering approximately 1,380,912 shares of common stock under the Company's Executive Compensation Plan when the Merger closed and was eligible for certain bonus payments tied to designated milestones. Whitesides also held options in Virgin Orbit for 905,614 shares at an exercise price of $4.81. Due to their extensive professional and financial connections, including their roles at Virgin Galactic, Whitesides is closely tied to and beholden to Branson. Whitesides is a citizen of California.

24.     The "Director Defendants" are Austin, Bain, Colglazier, Jonas, Kreeger, Lovell, Mattson, Palihapitiya, Ryans, West, and Whitesides.

25.     The "Officer Defendants" are Colglazier and Whitesides. The Officer Defendants together with the Director Defendants are the "D&O Defendants."

## IV.     FACTUAL BACKGROUND

### A.     VIRGIN GALACTIC'S SPACESHIPS FACE REPEATED OPERATIONAL AND QUALITY CHALLENGES

26.     Virgin Galactic's business focuses on "pioneering a consumer space experience using reusable spaceflight systems." It is a vertically integrated business offering access to space

for private individuals, researchers and government agencies. The Company's operations include the design and development, manufacturing, ground and flight testing, and post-flight maintenance of spaceflight system vehicles, which were developed using proprietary technology and processes focused on providing space experiences for private astronauts, researcher flights and professional astronaut training.

27.     In its early years as a private company, Virgin Galactic experienced numerous safety and quality issues, including with its initial partner for design and production, Scaled Composites, which had little experience commercializing vehicles and had initially designed only prototypes intended to survive brief and limited trips to space.

28.     Not only were Scaled Composites' designs unfit for commercial space travel, but it had severely under-invested in safety measures. For example, the spacecrafts lacked safety latches and hooded covers on switches and knobs, instead mitigating risk by relying on pilots' procedures and professionalism. Critically, some of their prototype designs contained single point failures, rather than building in redundancies. As a Scaled Composites engineer said, "One bolt falls off and you die."

29.     Unsurprisingly, Scaled Composites suffered a host of safety failures which proved fatal to several individuals and its partnership with Virgin Galactic. First, in July 2007, an engine explosion at California's Mojave Air and Space Port resulted in the death of three employees. The engine was not even installed on a vehicle when it exploded. Afterwards, Scaled Composites determined that the petroleum glue composite liner inside the tank that feeds the engine had dissolved, contaminating the contents, causing friction when it passed through the valve, and triggering a gas explosion. The tank landed 800 feet from the explosion site, the valve 300 feet in the opposite direction.

30.     Scaled Composites narrowly avoided charges by persuading an OSHA investigator that its negligence had not been criminal. OSHA's report did not become public, and therefore, the local sheriff did not prosecute. Despite this fatal incident, Virgin Galactic pressed on with its joint venture with Scaled Composites.

31.     In October 2014, the test flight of Virgin Galactic's "SpaceShipTwo" vehicle prototype failed disastrously when it broke apart in the skies above the Mojave desert, killing co-pilot Michael Alsbury and injuring pilot Peter Siebold.

32.     The incident occurred because Scaled Composites did not design a failsafe to prevent the pilots from unlocking the "feather" when the shuttle reached the transonic zone. This is what the co-pilot did, and what caused the Enterprise to disintegrate in mid-flight. A National Transportation Safety Board investigation later concluded that "the probable cause of this accident was Scaled Composites' failure to consider and protect against the possibility that a single human error could result in a catastrophic hazard to the SpaceShipTwo vehicle." As a result, Virgin Galactic severed ties with Scaled Composites although it retained two aircrafts and recruited one of Scaled Composites' top test pilots, Mark Stucky ("Stucky").

33.     The October 2014 flight threw Virgin Galactic into crisis. Employees were troubled by the death and Branson hosted an all-hands meeting in a hangar, which ended with a group hug. The October 2014 flight also caused customers to demand refunds, and sponsors to back out. In a related press conference, Branson admitted, "We fell short," but stated that the Company was determined to "learn from this and move forward." Virgin Galactic then stopped all ticket sales.

34.     Two weeks after the October 2014 crash, a writer from the New Yorker, Nicholas Schmidle ("Schmidle"), "embedded" in the Company so that he could write an article about the process of building the next spaceship and Virgin Galactic's return to rocket-powered flights.

**B.    THE COMPANY LAUNCHES A NEW SPACESHIP, BUT STRUGGLES WITH CAPITAL AND OPERATIONS BEHIND THE SCENES**

35.    In 2015, Virgin Galactic's sister company, The Spaceship Company, took over building the Company's shuttles, including another "SpaceShipTwo" model, later dubbed VSS Unity. The Spaceship Company completed construction of the Unity in February 2016, and Branson threw a splashy event with celebrities and customers to unveil his latest spaceship.

36.    Behind the scenes, however, and undisclosed to customers and investors, commercial space travel was still far off and Branson and the Company knew it. Indeed, by 2018, two years after unveiling SpaceShipTwo, the Company was still nowhere close to launching its commercial operations, and it was burning through cash.

37.    In 2018, Branson estimated Virgin Galactic had spent nearly $1 billion on its space program since its inception. The Company had spent $118 million on research and development costs in 2018 alone, and had only earned $3 million that year. Branson's problem was that most of his companies, including Virgin Galactic, were private, meaning that he could not easily sell their shares to provide capital to Virgin Galactic. For example, Branson flew to visit the crown prince of Saudi Arabia, Mohammad bin Salam, and the prince pledged $1 billion to the program. Branson even hosted the prince in the U.S. and showed him around the Company's hangar in Mojave. But when news emerged about the prince's involvement in the murder of Jamal Khashoggi at the Saudi consulate in Istanbul, the deal fell through.

38.    As a privately-held company, Virgin Galactic's financing options were limited. By 2018, the market for SPACs was heating up and presented a potentially lucrative option for both Branson and Virgin Galactic. Notably, a SPAC could also allow to Branson to remain a controlling stockholder of the Company once it went public.

39.     To attract financing, Branson pushed for events showing the progress of Virgin Galactic's spaceships with himself at the center of them. For example, in April 2018, Virgin Galactic has a test flight to space, in which Branson walked out to a stage to welcome a crowd before the flight, stating, "I'm not allowed to say it, but hopefully we are going to space today!" The spaceships reached their final altitude of 275,000 feet, Stucky, the pilot, got on the radio, exclaiming, "Great motor burn, everybody. We're going to space, Richard!"

40.     Following the April 2018 mission, Branson and Virgin Galactic found a willing SPAC partner: the billionaire former Facebook executive and venture capitalist Chamath Palihapitiya, whose investment vehicle, Social Capital, was under a tight deadline to close a merger with another company.

41.     Palihapitiya and his fellow Social Capital director, Bain, thought Branson and Virgin Galactic together were iconic and eagerly supported Branson's desire to remain as the face of Virgin Galactic, including its first passenger flight to space.

42.     On October 17, 2018, Virgin Galactic began exploring a merger with Social Capital with a meeting between a Virgin Galactic director and an employee of Social Capital's investment advisor. Palihapitiya then authorized the banker to proceed with discussions.

43.     After a series of additional meetings, on January 24, 2019, Social Capital sent Virgin Galactic an initial non-binding letter of intent. On February 5, 2019, Social Capital agreed to a crucial new term that would allow Branson to liquidate some of his Virgin Galactic holdings while still remaining a controlling stockholder. As Virgin Galactic and Social Capital continued to negotiate the SPAC transaction's terms, another costly disaster hit one of the Company's spaceships—which the Company concealed, *see infra* Part IV.C.

C.   **VIRGIN GALACTIC CONCEALS THAT A TEST FLIGHT DESTROYED UNITY'S HORIZONTAL STABILIZERS WHILE CLOSING THE DEAL WITH SOCIAL CAPITAL**

44.     On February 22, 2019, Virgin Galactic performed its fifth-powered test flight of Unity, which flew to an altitude above 50 miles and then glided back down to earth. This flight included pilot David Mackay, co-pilot Frederick Sturckow, and Beth Moses, a former NASA scientist and Virgin Galactic's chief customer trainer, playing the role of a passenger for the flight.

45.     During the flight, Unity suffered critical damage to its horizontal stabilizers, which the Company covered up by quickly wheeling the shuttle into the hangar. The craft had a large gash running along the trailing edge of the right horizontal stabilizer.

46.     Sometime after December 13, 2018, Virgin Galactic had removed a layer of thermal protection from Unity's horizontal stabilizers, which it later re-covered with Kapton, a polyimide film. But when applying the Kapton, the technicians had covered the holes on the surface of the horizontal stabilizers designed to vent air—a critical process that allows air to escape before the Unity reaches space. Once in space, the lack of countervailing pressure from the outside resulted in internal air pushing on the surface until it found a weak spot and burst out. In simple terms, air inside the Unity's horizontal stabilizers had nowhere to go and ruptured under immense pressure.

47.     Virgin Galactic immediately grounded Unity after the nearly disastrous February 2019 flight. However, the Company made great efforts to keep the stabilizer problem and grounding quiet, worried that it might frighten the public and jeopardize the deal with Social Capital.

48.     But the Board intentionally concealed material nonpublic information concerning the destruction of Unity's horizontal stabilizers during the February 2019 flight as the Company sought to raise additional capital from Social Capital.

12

49.     To the public, Virgin Galactic CEO, Whitesides declared the flight an unmitigated success without disclosing any safety problems encountered during the flight and without telling investors and shareholders that the Unity was grounded as a result. Whitesides told the Associated Press the flight was so successful that Virgin Galactic could move onto the next milestone of developing its cabin. Branson similarly projected the image that the February 2019 flight was an utter success by posting favorable pictures on his Instagram.

50.      However, irreparable damage to Unity's horizontal stabilizers kept it grounded for fourteen months, until May 2020.

51.     On March 2, 2019, just a few weeks after the Unity's horizontal stabilizers had been destroyed during a test flight, Social Capital provided another letter of intent, which stated the business's total value was $850 million.

52.     On March 4, 2019, Branson and Lovell, on behalf of Virgin Galactic, and Bain and Palihapitiya, on behalf of Social Capital, attended two days of in-person meetings in Park City, Utah. In a revised April 3, 2019, letter of intent, a month later, Social Capital increased Virgin Galactic's valuation to $1.3 billion.

53.     On May 28, 2019, Palihapitiya had a call with Branson to discuss the status of negotiations between the parties, and to determine next steps to resolving the outstanding business issues. In a call on June 15, 2019, Palihapitiya and Branson verbally agreed to the terms of revised letter of intent. On June 16, 2019, Palihapitiya and Branson had another call to express their mutual commitment to the proposed de-SPAC transaction.

54.     On July 9, 2019, the parties executed an Agreement and Plan of Merger (the "Merger Agreement")[1] which valued Virgin Galactic at $1.3 billion and allowed Branson to liquidate a portion of his Virgin Galactic holdings while remaining the Company's controlling stockholder.

55.     For Social Capital, time was of the essence as it had already extended the deadline to complete a merger, and its stockholders had previously redeemed over $39 million of the Company's stock rather than wait any longer for the Company to find a merger partner.

56.     On September 17, 2019, Bain and Palihapitiya appeared on CNBC from Virgin Galactic's investor day to promote the Company, and disclosed that they were also Virgin Galactic customers waiting for their trips to space. During this interview, Bain gushed about Branson by calling him an "icon," and further stating Branson was one of the reasons why Social Capital was investing in Virgin Galactic.

57.      On October 25, 2019, the Merger closed, and Branson was able to immediately cash out over $150 million from the Merger, while remaining its controlling stockholder (i.e., nearly 59%) of the publicly traded Virgin Galactic.

### D.    THE MERGER AGREEMENT AND MERGER WITH SOCIAL CAPITAL

58.     The Merger Agreement provided for a series of transactions through which Social Capital, a publicly-traded Cayman Islands company, would eventually combine with Virgin Galactic and become a Delaware corporation whose stock and warrants would trade on the NYSE.

---

[1] Agreement and Plan of Merger, dated as of July, 9 2019, by and among Social Capital Hedosophia Holdings Corp., Foundation Sub 1, Inc., Foundation Sub 2, Inc., Foundation Sub LLC, TSC Vehicle Holdings, Inc., Virgin Galactic Vehicle Holdings, Inc., VGH, LLC, and Vieco 10 Limited (attached to July 8-K, defined below, as "Exhibit 2.1"). *See* Virgin Galactic's Form 8-K Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934, filed July 11, 2019, Accession No. 0001144204-19-034352 (hereinafter, "July 8-K").

59.     Social Capital issued a Proxy Statement/Prospectus that was sent to the Company's shareholders to vote on the Merger and related proposals. As of the date of the Proxy Statement/Prospectus, there were 82,478,822 shares issued and outstanding, which included 17,250,000 founder shares held by the Sponsor (Palihapitiya) and 65,228,822 public shares.

60.     As part of the Merger, all outstanding shares of common stock or limited liability company interests, as applicable, of each of the Virgin Galactic companies were cancelled in exchange for the right to receive 130,000,000 shares of the Company's common stock, which was deemed to have a value of $10.00 per share for an aggregate merger consideration of $1.3 billion.

61.     Following the Merger and related transactions, Branson held 58.7% of the Company's stock, while Palihapitiya held 16.6% of it. Thus, after the Merger closed, Branson and Palihapitiya controlled more than 70% of the Company's voting power.

62.     Branson and Palihapitiya also entered into a Stockholders' Agreement that allowed them to pack a majority of Virgin Galactic's Board with loyal directors and gave them control over the Company's business policies and significant corporate transactions.

63.     Specifically, Branson appointed three directors, while Palihapitiya appointed two directors and took on the role of Chair of the eight person Board.

64.     The Company's SEC filings, including its Offering Registration Statements,[2] described the impact of the Stockholders' Agreement as follows:

> For so long as [Branson and Palihapitiya] hold a substantial amount of our common stock, they will be able to effectively control the composition of our board of directors, which in turn will be able to control all matters affecting us, subject to the terms of the Stockholders' Agreement, including:

---

[2] *See* Amendment No. 2 to Virgin Galactic's Form 10-K Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934, filed May 10, 2021, Accession No. 0001706946-21-000056 (hereinafter, "May 10-K"); Virgin Galactic's Form S-1 Registration Statement Under the Securities Exchange Act of 1933, filed Aug. 3, 2020, Accession No. 0001628280-20-011465 (hereinafter, "Aug. S-1").

any determination with respect to our business direction and policies, including the appointment and removal of officers and, in the event of a vacancy on our board of directors, additional or replacement directors; any determinations with respect to mergers, business combinations or disposition of assets; determination of our management policies; our financing policy; our compensation and benefit programs and other human resources policy decisions; and the payment of dividends on our common stock.[3]

65.     Additionally, the Company's SEC filings explain that under the terms of the Stockholders' Agreement Branson possessed significant control over the Company's operations:

[F]or so long as VIL and Aabar Space, Inc. ("Aabar") continue to beneficially own, in the aggregate, at least 25% of the shares of our common stock that an affiliate of VIL beneficially owned upon completion of the Virgin Galactic Business Combination, VIL's consent is required for, among other things: any non-ordinary course sales of our assets having a fair market value of at least $ 10.0 million; any acquisition of an entity, or the business or assets of any other entity, having a fair market value of at least $10.0 million; certain non-ordinary course investments having a fair market value of at least $10.0 million; any increase or decrease in the size of our board of directors; any payment by us of dividends or distributions to our stockholders or repurchases of stock by us, subject to certain limited exceptions; or incurrence of certain indebtedness.[4]

66.     In fact, as long as Branson holds at least 10% of the Company's stock, his consent as a controlling stockholder is required for the following, among other things under the Stockholders' Agreement:

any sale, merger, business combination or similar transaction to which we are a party; any amendment, modification or waiver of any provision of our certificate of incorporation or bylaws; any liquidation, dissolution, winding-up or causing any voluntary bankruptcy or related actions with respect to us; or any issuance or sale of any shares of our capital stock or securities convertible into or exercisable for any shares of our capital stock in excess of 5% of our then-issued and outstanding shares, other than issuances of shares of capital stock upon the exercise of options to purchase shares of our capital stock.[5]

---

[3] May 10-K at 40 (bullet formatting omitted); Aug. S-1 at 31 (bullet formatting omitted).
[4] May 10-K at 40 (bullet formatting omitted); Aug. S-1 at 31 (bullet formatting omitted).
[5] May 10-K at 41 (bullet formatting omitted); Aug. S-1 at 33 (bullet formatting omitted).

67. Thus, through his stock ownership, control of the Board through the appointment of loyal directors having common financial interests and otherwise beholden to him, and a Stockholders' Agreement guaranteeing him control over all aspects of the Company's business, Branson was able to exert dominance over the Company and its Board.

### E.   IN 2020, THE BOARD CONTINUES TO CONCEAL CONCERNING INFORMATION ABOUT THE COMPANY'S SPACESHIPS

68. Immediately following the closing of the Merger, the Board began to receive information regarding safety and operational issues. In a December 2019 meeting, the Board learned of that post-flight repairs were necessary because the Company's spaceships were not designed to withstand regular flights into space, which the Board continued to conceal from investors.

69. As the Company's controlling stockholder, Branson also knew about this material nonpublic information through his connections with his Board designees, Kreeger, Lovell, and Mattson, his long-term relationships with Virgin Galactic's management, including Whitesides and Moses, and his newly formed close bonds with Palihapitiya and Bain. Indeed, Branson relied on information from his connections to ensure that he would be ready to fly on Virgin Galactic's first passenger flight, and to continue to promote the Company on his social media accounts, among other places, as Virgin Galactic was one of his favorite vanity projects.

70. Branson also had access to this material nonpublic information because he continued to appear at the Company's public events, where he could interact face-to-face with Virgin Galactic's senior officers—Branson's preferred method of communication.

71. For example, on May 12, 2020, Branson appeared at the Company's press conference to announce Virgin Galactic's move to New Mexico. At that press conference,

Whitesides went so far as to state that the move to New Mexico put the Company in the "home stretch" for the launch of commercial operations.

72.     As such, Branson would have known about all material nonpublic information related to the destruction of Unity's horizontal stabilizers and the delays in the launch of commercial operations due to Eve's pylon replacement by no later than May 12, 2020 when he met in person with his close confidant Whitesides at this press conference.

73.     Taking all things into consideration—*e.g*., Branson's close personal relationships with several directors and officers of Virgin Galactic—Branson almost certainly become aware of this material nonpublic information much earlier. In addition, the Stockholders' Agreement required Branson to know about material nonpublic information because the Board needed to obtain his consent before taking actions, including raising additional funds for the Company's operations

74.     Branson took unfair advantage of his knowledge of material nonpublic information by selling $547.1 million of the Company's stock in May and June 2020. Specifically, from May 14-22, Vieco sold 23.7 million shares for total proceeds of $358.8 million. On June 2 and 5, Vieco sold another 12.5 million Virgin Galactic shares for total proceeds of $188.3 million.

75.     Shortly thereafter, on August 5, 2020, Virgin Galactic's CEO, Colglazier and Virgin Galactic's CFO, Jon Campagna authorized Virgin Galactic to sell 23,600,000 shares of stock at $19.50 each for total proceeds of $460.2 million through an offering, which included a Registration Statement signed by the entire Virgin Galactic Board.

76.     In early November 2020, Colglazier then laid out a plan to "fly SpaceShipTwo from multiple spaceports around the world. There would be 400 flights per year from each spaceport,

with each SpaceShipTwo flying 50 times annually over a lifespan of 10 years. The spaceport would generate $1 billion in revenues apiece on an annual basis from flights and ancillary sources."

77.    On December 12, 2020, Virgin Galactic attempted a test flight, in which Unity's engine shutdown prematurely. Thereafter, on December 14 and 15, 2020, Palihapitiya sold 3.8 million personally-held shares for total proceeds of $97.8 million.

78.    Together, Branson and Palihapitiya sold $644.9 million of their Virgin Galactic stock in reliance on material nonpublic information concerning an undisclosed protracted delay of the launch of the Company's commercial operations in light of the Company's spaceships needed extensive repairs, which included: (1) the destruction of Unity's horizontal stabilizers during the February 2019 flight, and (2) the need to replace Eve's pylon before the launch of commercial operations.

79.    The Board further acted in bad faith by concealing this material nonpublic information so the Company could raise approximately $460 million in funds through the sale of its stock. Due to their close ties with Branson and Palihapitiya, the other members of the Board were also incentivized to conceal this material nonpublic information because they knew Branson and Palihapitiya wanted to sell some of their Virgin Galactic stock at this time.

**F.    A WASHINGTON POST ARTICLE EXPOSES THE TRUTH ABOUT VIRGIN GALACTIC'S NEARLY FATAL 2019 FLIGHT**

80.    On February 1, 2021, Virgin Galactic announced that it had secured a launch window to fly the Unity later in the month.  Later that same day, after close of trading, The Washington Post published an article disclosing the truth about the February 2019 test flight that nearly ended in three deaths, and that "when the ground crew wheeled the suborbital spacecraft back into the hangar, company officials discovered that a seal running along a stabilizer on the

wing designed to keep the space plane flying straight had come undone—a potentially serious safety hazard."

81.    In a similar February 2, 2021 article, reporter Doug Messier, quoted a Virgin Galactic insider as stating that Unity's whole horizontal stabilizers ruptured. According to Messier, the cover-up began during the flight. An insider told Messier that the pilots "landed long to avoid cameras."

82.    Messier's source described the Unity's elevons (a portion of horizontal stabilizers) as "[w]ay too damaged to fly again. Whole structure ruptured."

83.    Approximately a month later, on March 2 and 3, 2021, Palihapitiya sold his remaining 6.2 million personally held shares received on the Merger for total proceeds of $212.8 million.

84.    As a consequence of Palihapitiya liquidating his entire position in Virgin Galactic—less than two years after the Merger closed—Branson took over as the Company's sole controlling stockholder again under the terms of the Stockholders' Agreement, and would remain so as long as he owed at least 10% of the Company's stock.

### G.    VIRGIN GALACTIC RACES TO RECORD THE FIRST COMMERCIAL SPACE FLIGHT DESPITE THESE OPERATIONAL AND SAFETY ISSUES

85.    By 2021, the competition to be the first commercial operator of space flights was intense between Branson's Virgin Galactic, Jeff Bezos's Blue Origin, and Elon Musk's SpaceX. For years, Branson had told Virgin Galactic executives and directors that he wanted to be "the first of the three entrepreneurs fighting to put people into space to get there."

86.    Having stopped ticket sales following the October 2014 accident, the Company revamped plans to increase the price of a seat on its space trips if Branson's flight was deemed a success.

87.     Between April 12, 2021 and April 14, 2021, Branson sold 5.584 million shares of the Company's stock for total proceeds of $150.3 million to raise additional capital for his multiple privately-held companies, which were underfunded and unable to easily access the capital markets, while in possession of material non-public information concerning, among other things, delays facing the launch of Virgin Galactic's commercial operations.

88.     On May 10, 2021, in a Q1 2021 earnings call, Colglazier mentioned that:

> Our next maintenance cycle is planned for later this fall and prior to Eve's last flight, all inspections confirmed our schedule was on track. However, following this last inspection, we identified an item on our maintenance calendar that needs further study to determine whether we need to take action now instead of the fall as planned.

89.      Notably, Colglazier stated that any "maintenance" would take approximately four months to complete, even though he and the rest of the Board knew Unity, the Company's other spaceship, required a repair period of at least six months or longer before commercial operations could begin, based on the information conveyed to them at the Board's March 24, 2021 meeting.

90.     On June 6, 2021, Bezos announced that he would fly on Blue Origin's first passenger flight into space and that the flight would take place on July 20, 2021, to coincide with the 52nd anniversary of Apollo 11's moon landing.

91.     Bezos' announcement set off an internal debate at Virgin Galactic about accelerating its schedule so that Branson could "beat" Bezos into space, despite unresolved issues with the Federal Aviation Administration (the "FAA") related to the Company's designated airspace. Indeed, the Board had failed for multiple years to ensure that the Company was complying with FAA safety regulations with respect to designated airspace during a flight.

92.     On July 1, 2021, Virgin Galactic announced that it would take Branson to space on July 11, 2021, or nine days before Bezos's flight. Notably, to investors, that flight also signaled

that Virgin Galactic would launch the restart of ticket sales and commercial flights shortly thereafter. But, as Defendants knew, the Company's commencement of commercial operations was many months, if not over a year away, due to extensive repairs required to its spaceships, which were not designed to withstand regular flights to space.

93.     Notwithstanding the fact that Virgin Galactic's launch of its commercial space operations would experience protracted delays in making repairs to the Company's spaceships, the Board planned for another capital raise while intentionally concealing this information from investors in breach of its fiduciary duties.

94.     On June 17, 2021, the Company filed an amended Registration Statement with the SEC, which was signed by the entire Board.

**H.      VIRGIN GALACTIC CONCEALS FAA VIOLATIONS DURING THE JULY 2021 TEST FLIGHT TO SECURE ADDITIONAL CAPITAL AND FACILITATE INSIDER SALES**

95.     Virgin Galactic and its Board have recognized and repeatedly disclosed the importance of compliance with FAA regulations over space flights. For example, Virgin Galactic's 2021 Form 10-K stated that:

> The regulations, policies, and guidance issued by the FAA apply to the use and operation of our spaceflight system. When we operate our spaceflight system as "launch vehicles," meaning a vehicle built to operate in, or place a payload or human beings in, space, the FAA's commercial space transportation requirements apply. Operators of launch vehicles are required to have proper licenses, permits and authorizations from the FAA and comply with the FAA's insurance requirements for third-party liability and government property. . . .
>
> When not operating as launch vehicles, our spaceflight system vehicles are regulated as experimental aircraft by the FAA. The FAA is responsible for the regulation and oversight of matters relating to experimental aircraft, the control of navigable air space, the qualification of flight personnel, flight training practices, compliance with FAA aircraft certification and maintenance, and other matters affecting air safety and operations. . . .

Failure to comply with the FAA's aviation or space transportation regulations may result in civil penalties or private lawsuits, or the suspension or revocation of licenses or permits, which would prevent us from operating our spaceflight system.[6]

96.     Significantly, the FAA's regulation, Part 431, details the rules for "Launch and Re-Entry of a Reusable Launch Vehicle (RLV),"[7] which Virgin Galactic is required to comply with to operate safely to maintain its license.   Additionally, section 431.39 requires that: "(a) An applicant shall submit mission rules, procedures, checklists, emergency plans, and contingency abort plans, if any, that ensure safe conduct of mission operations during nominal and non-nominal vehicle flight[;]" and "(b) Mission rules, procedures, checklists, emergency plans, and contingency abort plans must be contained in a safety directive, notebook, or other compilation that is approved by the safety official designated under § 431.33(c) and concurred in by the launch site operator and reentry site operator, if any."[8]

97.     In addition, Virgin Galactic was also required to comply with § 431.41's Communication Plan:

(a) An applicant shall submit a plan providing vehicle safety operations personnel communications procedures during the mission. Procedures for effective issuance and communication of safety-critical information during the mission shall include hold/resume, go/no go, contingency abort, if any, and emergency abort commands by vehicle safety operations personnel. The communications plan shall describe the authority of vehicle safety operations personnel, by individual or position title, to issue these commands. The communications plan shall ensure that –

(1) Communication networks are assigned so that personnel identified under this section have direct access to real-time, safety-critical information required for making decisions and issuing commands;

---

[6] May 10-K at 20.
[7] 14 C.F.R. § 431.1(b).
[8] *Id.* § 431.39(a)-(b).

(2) Personnel identified under this section monitor a common intercom channel for safety-critical communications during launch and reentry;

(3) A protocol is established for utilizing defined radio communications terminology; and

(4) Communications affecting the safety of the mission are recorded in a manner that accurately reflects communications made on individual channels, synchronized time coding, and sequence of communications.

(b) An applicant shall submit procedures to ensure that licensee and reentry site personnel, if any, receive a copy of the communications plan required by this section and that the reentry site operator, if any, concurs with the communications plan.

98.     As a result of the D&O Defendants' oversight failures, Virgin Galactic failed to implement the critical safety measures and compliance systems required by the FAA's § 431.39 and § 431.41.

99.     Nevertheless, the Board accelerated Branson's flight to precede Bezos' flight by nine days.

100.    On July 11, 2021, Virgin Galactic's Unity, with Branson aboard, climbed to 50 miles above Earth's surface before returning to land. But, the safety and reporting risks relating to the FAA's designated airspace materialized.

101.    In violation of FAA regulations—§§ 431.39, 431.41—Virgin Galactic strayed outside of its designated airspace for 10% of the flight, but did not disclose this to investors or report it to the FAA, and instead declared the flight a "success." The Board's Safety Committee failed to oversee whether the Company had systems in place to comply with the FAA's regulations if one of its spaceships deviated from its designated airspace.

102.    Staying in the designated airspace and promptly reporting any such deviations to the FAA was critical to preventing collisions with other aircrafts and safely navigating the craft

back to Earth. The amount of designated airspace is important for the landing process, where pilots must aim for an imaginary inverted vertical landing cone. Unity "enters" the cone when dropped by Eve and is supposed to stay within the cone during the entire flight. The cone gradually narrows until Unity reaches the landing strip.

103.    Deviating from the cone is dangerous because the vehicle may not have enough energy to make it back to the landing strip and would crash land.

104.    On the July 11 flight, when Unity had reached 20 miles (about 30 miles short of its apogee), a yellow indicator light turned on in Unity's cockpit signaling that it was straying from the glide cone.  Additionally, and only five to seven seconds before the end of Unity's burn, the red indicator light turned on, signaling that it had strayed from the landing cone. While the pilots were eventually able to bring Unity back into its glide cone, Unity had stayed outside of its FAA airspace a total of 1 minute and 41 seconds, or more than 10% of the journey, which could have been catastrophic if another aircraft was in that designated area.

105.    From the start, Virgin Galactic concealed these critical FAA violations from its stockholders and investors.

106.    Virgin Galactic issued a press release calling the flight a "landmark achievement" and "historic moment." In reality, Branson, the Board and Virgin Galactic's management were intentionally hiding the Company's nonpublic material information that: (1) the launch of Virgin Galactic commercial operations was at least a year away because the Company's spaceships needed extensive repairs; and (2) Virgin Galactic violated the FAA's regulations in multiple ways on July 11, 2021.

107.     Between July 12 and 16, 2021, Colglazier and Ahrens authorized Virgin Galactic's sale of $500 million of its shares, while investors believed the flight had been successful and that regular commercial flight was a near term possibility for Virgin Galactic.

108.     On July 23, 2021, the FAA received a text message from Albuquerque Air Control Center, which stated that Virgin Galactic's spaceship had gone out of its protected airspace during the July 11, 2021 flight. The FAA then met with Albuquerque's Flight Standards District Office about the July 11, 2021 flight.

109.     Thereafter, in July and August 2021, the Company and the FAA engaged in discussions regarding the deviation from the planned flight path and the loss of the Company's license until the issues were remediated.

110.     Around the same time, based on his knowledge of the Company's material nonpublic information concerning (1) the FAA violations stemming from his July 11, 2021 flight and (2) the delay in the launch of commercial operations due to the spaceships' need for extensive repairs, Branson sold 10.4 million shares for total proceeds of $299.9 million on August 10-12, 2021.

111.     On August 17, 2021, Kreeger, the Chairperson of the Safety Committee, sold 10,000 shares of Virgin Galactic stock for over $250,000. When Kreeger made his stock sales, he was motivated to do so based on his knowledge that the July 11, 2021 flight had resulted in multiple FAA violations, which had caused Virgin Galactic to lose its commercial license until remediated. Kreeger was further motivated by his knowledge of the material nonpublic information concerning the spaceships' need of necessary repairs for a protracted period of time, which would delay the launch of Company's commercial operations.

112.    Following Branson's purportedly successful test flight, the Company reopened ticket sales and increased the pricing of its consumer offerings to a base price of $450,000 per seat, which required a $150,000 deposit of which $25,000 was nonrefundable. By the end of 2021, the Company had received an additional 100 reservations.

113.    The Safety Committee had ignored warnings from its earlier June 2020 and June 2021 meetings that Virgin Galactic needed to increase the size of its special airspace to prevent FAA violations and the potential for a fatal catastrophe. Moreover, in addition to the physical repairs required for Virgin Galactic's spaceships, it was also abundantly clear to the Board that ongoing personnel deficiencies and a lack of third-party oversight were also imperiling the viability of the Company's commercial operations.

114.    On September 1, 2021, The New Yorker released an article written by Nicholas Schmidle concerning the July 11, 2021 flight.[9] Notably, the article disclosed that the flight had resulted in FAA violations, which required the grounding of Virgin Galactic's spaceships and the loss of its commercial license until the Company corrected certain critical safety deficiencies.

115.    Schmidle described the air cone deviation as follows:

> Although Mackay and Masucci attempted to address their trajectory problem, it wasn't enough. And now they were accelerating to Mach 3, with a red light glowing in the cockpit. Fortunately for Branson and the three other crew members in the back, the pilots got the ship into space and landed safely. But data retrieved from Flightradar24 shows the vehicle flying outside its designated airspace. An F.A.A. spokesperson confirmed that Virgin Galactic "deviated from its Air Traffic Control clearance" and that an "investigation is ongoing." A Virgin Galactic spokesperson acknowledged that the company did not initially notify the F.A.A. and that the craft flew outside its designated airspace for a minute and forty-one seconds-flights generally last about fifteen minutes-but said that the

---

[9] Nicholas Schmidle, *The Red Warning Light on Richard Branson's Space Flight, The F.A.A. is investigating the ship's off-course descent*, NEWYORKER.COM (Sept. 1, 2021), https://www.newyorker.com/news/news-desk/the-red-warning-light-on-richard-bransons-space-flight.

company was working with the F.A.A. to update procedures for alerting the agency.[10]

116.    On September 16, 2021, Virgin Galactic announced that it had resolved the FAA's concerns but concealed that it still had not received approval from the FAA to relaunch its commercial space flights.

## I.    THE PROXY DEFENDANTS VIOLATED SECTION 14(A) AND BREACHED THEIR FIDUCIARY DUTIES

117.    On July 13 2021—two days after Branson's July 11 flight—Defendants Austin, Bain, Colglazier, Jonas, Kreeger, Lovell, Mattson, Palihapitiya, and West (the "Proxy Defendants") caused Virgin Galactic to file its annual 2021 Proxy Statement[11] in connection with the 2021 annual stockholders meeting.

118.    In the 2021 Proxy Statement, these Defendants solicited stockholder votes to, among other things, re-elect themselves to the Board. With respect to each of these solicited votes, these Defendants issued materially false or misleading statements.

119.    With respect to Board re-elections, the 2021 Proxy Statement represented:

Our Nominating and Corporate Governance Committee is responsible for, among other things:

- assisting our Board of Directors in identifying individuals qualified to become members of our Board of Directors, consistent with criteria set forth in our governance guidelines;
- recommending director nominees for election to our Board of Directors;
- reviewing the appropriate composition of our Board of Directors and its committees;
- providing oversight with respect to the Company's environmental, social and governance strategy, initiatives and policies; and

---

[10] *Id.*
[11] Virgin Galactic's Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934, filed July 13, 2021, Accession No. 0001140361-21-024231 (the "2021 Proxy Statement").

- developing and recommending to our Board of Directors a set of corporate governance guidelines and principles.[12]

120.    The 2021 Proxy represented:

We are also keenly focused on human safety. Our Safety Management System (SMS) is informed by Federal Aviation Administration guidance and is in line with national and international policies and other flight standards. We have a proactive safety risk management process to identify potential safety hazards, minimize risks and ensure proper corrective actions where appropriate. Our process and protocols are audited regularly to ensure compliance to the latest standards, to monitor and document issues, and develop corrective action plans with the operations teams.[13]

121.    The 2021 Proxy statement further represented that the Safety Committee is responsible for, among other things:

- reviewing our safety performance, including processes to ensure compliance with internal policies and goals and applicable laws and regulations;
- providing input on the management of current and emerging safety issues;
- assisting our Board of Directors with oversight of our risk management and security processes;
- reviewing safety audit findings and resulting action plans; and
- periodically visiting our facilities and reviewing any safety issues.[14]

122.    In addition, the 2021 Proxy Statement represented that the Audit Committee members' responsibilities included, "reviewing and monitoring our accounting principles, accounting policies and financial and accounting controls and compliance with legal and regulatory requirements."[15]

123.    Those statements misleadingly conveyed that the Board and its committees: (i) maintained sufficient compliance, risk controls, review, and reporting programs to identify and

---

[12] *Id.* at 28.
[13] *Id.* at 32.
[14] *Id.* at 28.
[15] *Id.* at 26.

address misconduct; (ii) was unaware of existing material risks that could affect the Company; and (iii) maintained adequate internal controls and systems related to safety and compliance with regulatory standards.

124.    The 2021 Proxy Statement failed to disclose material facts concerning: (i) a protracted delay of the launch of the Company's commercial operations because the Company's spaceships needed extensive repairs before it could begin commercial space flights; and (ii) deficient reporting protocols for alerting the FAA when the Company failed to comply with safety regulations that potentially threatened its flight license, including during the July 11, 2021 flight.

125.    Virgin Galactic's commercial space flights were not imminent nor did the Company have the scale to make the flights a regular occurrence. Nor did Virgin Galactic have critical safety protocols to comply with the FAA's regulations during its flights.

126.    The 2021 Proxy Statement harmed Virgin Galactic by preventing an informed stockholder vote for directors. As a result of the false or misleading statements in the 2021 Proxy Statement, Virgin Galactic stockholders voted to re-elect Defendants Austin, Bain, Colglazier, Jonas, Kreeger, Lovell, Mattson, Palihapitiya, and West.

## J.    VIRGIN GALACTIC ANNOUNCES A SIGNIFICANT DELAY ON ITS NEXT FLIGHT FOR EXTENSIVE REPAIRS

127.    On October 14, 2021, Virgin Galactic issued a press release announcing that it would delay its next revenue producing flight until at least Q4 2022.

> The enhancement program is designed to improve vehicle performance and flight-rate capability for VMS Eve and VSS Unity. In preparation for this work, Virgin Galactic has been performing routine tests and analyses to update its material properties database. This data predicts how materials are expected to perform under certain load and environmental conditions and is used to inform the design and manufacturing enhancements that will support increased flight frequency. One of these recent laboratory-based tests flagged a possible reduction in the strength margins of certain materials used to modify specific joints, and this requires further physical inspection.

As is standard in aerospace test and evaluation practices, Virgin Galactic ships are designed to withstand forces that are substantially higher than those experienced in regular use, providing additional margin and layers of safety. The enhancement program is designed to further increase margins that will enable improved reliability, durability and reduced maintenance requirements when in commercial service. While this new lab test data has had no impact on the vehicles, our test flight protocols have clearly defined strength margins, and further analysis will assess whether any additional work is required to keep them at or above established levels. Given the time required for this effort, the Company has determined the most efficient and expedient path to commercial service is to complete this work now in parallel with the planned enhancement program.[16]

128.    On a November 8, 2021 call to discuss Q3 2021 earnings, Defendants disclosed that Eve needed extensive maintenance, including to its defective launch pylons and horizontal stabilizers. During the call, Colglazier confirmed during questioning that the enhancement period would take at least "8 to 9 months."

129.    On February 17, 2022, Palihapitiya unexpectedly resigned, effective immediately, from his position as Chairperson of the Board and a member of the Board. Branson's director appointee, Lovell then began serving as Interim Chairperson of the Board.

130.    On May 5, 2022, in a press release discussing QI 2022 earnings, the Company announced a further delay related to the launch of commercial operations, quoting Colglazier as stating: "We look forward to returning to space in the fourth quarter and launching commercial service in the first quarter of next year."[17]

131.    Virgin Galactic further disclosed that, in January 2022, it had completed a convertible debt offering that resulted in $425 million in gross proceeds to the Company. On

---

[16] *Virgin Galactic Begins Planned Vehicle Enhancement and Modification Period; Unity 23 Test Flight Rescheduled to Follow Completion of This Program*, BUSINESSWIRE.COM (Oct. 14, 2021), https://www.businesswire.com/news/home/20211014006083/en/.

[17] *Virgin Galactic Announces First Quarter 2022 Financial Results*, (May 5, 2022) (attached as "Ex. 99.1" to Virgin Galactic's Form 8-K Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934, filed May 5, 2022, Accession No. 0001706946-22-000067).

August 4, 2022, in a press release discussing Q2 2022 earnings, the Company announced another delay to the launch of its commercial service to "Q2 2023 due to extended completion dates within the mothership enhancement program."[18]

### K.   SECURITIES LITIGATION IS FILED AND A FEDERAL COURT FINDS THAT THE COMPANY MISREPRESENTED AND CONCEALED THE PROBLEMS ARISING ON ITS TEST FLIGHTS

132.   On May 21, 2021, a stockholder filed a federal securities class action against the Company relating to, among other things, the Company's material misstatements regarding the February 2019 and July 2021 test flights. *Kusnier v. Virgin Galactic Holdings, Inc.*, No. 21-CV-03070-ARR-TAM (the "Securities Action").

133.   On November 7, 2022, the judge in the Securities Action denied, in part, the defendants' motion to dismiss and held that the Company had "tout[ed] the success of the February 2019 flight in a materially misleading way,"[19] including that the "test flights had 'demonstrated the repeatability of the full flight profile' and showed that [the Company] 'ha[d] overcome a substantial number of the technical hurdles required to make the company a viable and profitable commercial service.'"[20]

134.   The Company had also misled investors about "the July 11, 2021 flight that took Branson to space," including with respect to the Company's "incredibly safety diligent program . . . [which is] anchored in safety experience" and that the flight was "devoid of 'major technical issues.'"[21]

---

[18] *Virgin Galactic Announces Second Quarter 2022 Financial Results And Provides Business Update, Advancement of Strategic Initiatives Positions the Company for Scaled Growth* (Aug. 4, 2022) (attached as "Ex. 99.1" to Virgin Galactic's Form 8-K Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934, filed Aug. 4, 2022, Accession No. 0001706946-22-000123).
[19] *Kusnier v. Virgin Galactic Holdings, Inc.*, 2022 WL 16745512, at *17 (E.D.N.Y. Nov. 7, 2022).
[20] *Id.* at *9.
[21] *Id.* at *12.

135.    As a result of the Defendants' conduct, the Company is forced to expend time, money and resources defending the Securities Action.

## V.    DEMAND FUTILITY ALLEGATIONS

136.    Plaintiff is a current owner of Virgin Galactic common stock and was owner of Virgin Galactic common stock during the period relevant to Defendants' wrongful course of conduct alleged herein. Virgin Galactic is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

137.    Plaintiff brings this action derivatively to redress injuries suffered, and to be suffered, by the Company as a direct result of the breaches of fiduciary duty, unjust enrichment, corporate waste, contribution and indemnification, and violations of Section 14(a) of the Securities Exchange Act. Plaintiff will adequately and fairly represent the interests of Virgin Galactic in enforcing and prosecuting its rights. Prosecution of this action, independent of the Virgin Galactic Board, is in the best interests of the Company.

138.    The Virgin Galactic Board, at the time of filing of this action, consisted of nine directors; accordingly, Plaintiff needs only to allege demand futility as to five of those nine directors.

139.    As alleged above, Defendants breached their fiduciary duties of loyalty and good faith by, *inter alia*, (i) engaging in a course of conduct that violated federal laws and regulations and the Company's policies; and (ii) failing to disclose to the investing public material adverse information regarding Virgin Galactic's business while insiders and the Company sold approximately $2 billion of the Company's stock.

140.    Plaintiff has not made any demand on Virgin Galactic's current Board (the "Demand Board") to bring an action on behalf of the Company asserting claims herein to recover

damages for the injuries suffered by Virgin Galactic, since such demand would have been a futile, wasteful and useless act, and is therefore excused, for the reasons stated herein.

### A.      FUTILITY AS TO COUNT I

141.    Eight of the nine members who comprise the Demand Board—*i.e.*, Defendants Austin, Bain, Colglazier, Jonas, Kreeger, Lovell, Mattson, and West cannot act impartially.

142.    Demand is excused because the Director Defendants, under the leadership of Palihapitiya, face a substantial likelihood of liability for the claims asserted against them in this Complaint, because they intentionally failed to disclose material nonpublic information related to: (1) the destruction of the horizontal stabilizers on one of the Company's spaceships during a February 2019 flight; (2) the violation of FAA regulations during a July 2021 flight, which resulted in the grounding of the Company's spaceships and temporary revocation of the Company's commercial flight license; and (3) an undisclosed protracted delay of the launch of the Company's commercial operations because the Company's spaceships needed extensive repairs.

143.    As a result of the Board's actions to conceal such information, insiders were able to sell over $1.3 billion of their personal holdings of Virgin Galactic stock. In addition, the Director Defendants ignored their oversight duties by allowing Virgin Galactic's spaceships to operate while failing to ensure that the Company had safety systems in place to comply with the FAA's regulations, including § 431.39 and § 431.41, which put the Company's spaceships at risk of causing a catastrophic event and/or the loss of its license to operate commercial spacecraft.

144.    Accordingly, more than a majority of the Demand Board could not impartially evaluate a demand because they face a substantial likelihood of personal liability because they allowed the Company to conceal the material nonpublic information. While concealing such information, more than a majority of the Demand Board instructed the Company to raise capital, which required Branson's authorization under the Stockholders' Agreement. Additionally, more

than a majority of the Demand Board took no further action against Palihapitiya, Branson, and Kreeger for using the Company's proprietary and material nonpublic information when they sold over $1.3 billion of their personal holdings of Virgin Galactic common stock.

145.    In addition, more than a majority of the Demand Board also cannot impartially consider a demand because, as members of the Audit Committee (*i.e.,* Jonas, Kreeger, and West) and the Safety Committee (*i.e.,* Austin, Lovell, Kreeger, and West), they utterly failed in their oversight responsibilities related to the Company's compliance with critical FAA regulations, including § 431.39 and §431.41.

146.    As a result of the Defendants' conduct, the Company now faces a federal securities class action in which the court has denied a motion to dismiss and found that the Company made material misrepresentations regarding the success of its February 2019 and July 2021 test flights.

### B.    FUTILITY AS TO COUNTS II-V

147.    A majority of the Demand Board also lacks the ability to consider a demand related to: Counts II (Breach of Fiduciary Duty Against the Officer Defendants); Count III (Breach of Fiduciary Duty for Insider Selling and Misappropriation of Confidential Information Against Defendants Branson, Kreeger, and Palihapitiya); Count IV (Unjust Enrichment Against all Defendants); and Count V (Contribution and Indemnification Against all Defendants).

148.    As outlined below, the following allegations show that a demand on the Demand Board would be futile as they give rise to an inference that each of the Director Defendants cannot independently consider claims arising against each of the other Defendants with regard to Counts II-V.

149.    Defendant Austin has served as a director since the Merger in October 2019, and is a member of the Safety Committee. Specifically, as a member of the Safety Committee, Austin failed in her oversight duties related to the Company's compliance with critical FAA regulations,

especially in light of her prior experience as President and CEO of The Aerospace Corporation, an independent nonprofit corporation operating the only federally funded research and development center for the space enterprise and performing technical analyses and assessments for a variety of government, civil, and commercial customers.

150.    Austin further permitted the Company to disseminate materially false and misleading statements, including statements in public offering documents, by disloyally concealing material information about the Company's operations as detailed above. As a result, she faces a substantial likelihood of liability for breaching her fiduciary duties by acting disloyally and in bad faith for violating her duties of oversight and disclosure, and therefore, demand is futile on Austin to consider suing the other Defendants for Counts 11-V, which arise from the same allegations as her breaches.

151.    In addition, Austin further lacks independence to sue her fellow Board members because her income earned from serving as a Virgin Galactic director is a material part of her annual income. In this regard, the majority of Austin's annual income stems for her three board positions (*i.e.*, Virgin Galactic, Amgen, Inc. and Chevron, Inc.), where she earns approximately $282,500.00, $360,000.00, and $320,500.00, respectively per year, including stock options. As such, Austin lacks independence to sue her fellow fiduciaries at Virgin Galactic because she wants to maintain her income as a Virgin Galactic director. Indeed, Austin, who owes her position on the Board to Branson and Palihapitiya, further exhibited this lack of independence from Branson, Palihapitiya and other directors (including fellow Safety Committee members) when she rejected the resignations offers of directors Bain, Mattson, and Kreeger, who were no longer eligible to be appointed to the Board by Branson and Palihapitiya under the terms of the Stockholders' Agreement.

152.    Defendant Bain has served as a director since the Merger in October 2019, and was a Social Capital director since September 2017. As a member of the Safety Committee, Bain failed in his oversight duties related to the Company's compliance with critical FAA regulations. Bain further permitted the Company to disseminate materially false and misleading statements, including statements in public offering documents, by disloyally concealing material nonpublic information about the Company's operations as detailed above. As a result, he faces a substantial likelihood of liability for breaching his fiduciary duties by acting disloyally and in bad faith for violating his duties of oversight and disclosure, and therefore, demand is futile on Bain to consider suing the other Defendants for Counts II-V, which arise from the same allegations as his breaches.

153.    In addition, Palihapitiya initially appointed Bain to the Board under the Stockholders' Agreement related to the Merger and was awarded 1.2 million shares of Virgin Galactic stock upon the Merger's closing due to such appointment. As a result, Bain is unlikely to take any legal action against Palihapitiya. Similarly, due to his loyalty to Palihapitiya for his lucrative directorship, Bain is unlikely to take any legal action against Ryans, who also served on Social Capital's board prior to the Merger with Palihapitiya, and serves as Social Capital's CFO with Palihapitiya. Bain is also unlikely to take any legal action against Branson, who he considers an "icon." In addition, Branson 's agreement to take Virgin Galactic public through the merger with Social Capital created millions in wealth for Bain once he received the 1.2 million shares. Bain is unlikely to sue the Board members (*i.e.*, Palihapitiya, Colglazier, Austin, Kreeger, Lovell, Mattson, and Ryans) that allowed him to pledge his 1.2 million as an exception to the Company's insider trading policy for a personal loan, which at the time was worth over $27 million and is still worth nearly $7 million dollars based on the closing price of the Company's stock on September 15, 2022. All of Bain's 1.2 million shares remain pledged to cover his personal loan. Bain further

lacks independence to sue Austin, Colglazier, Lovell, Jonas, Palihapitiya, and West because they rejected his attempt to resign from the Board after Palihapitiya lost his standing to appoint Bain to the Board under the Stockholders' Agreement. Moreover, Bain and Palihapitiya's close relationship as friends and fellow investors for many years as evidenced from a post from Palihapitiya's Twitter also makes him unable to bring suit against Palihapitiya.

154.   Defendant Colglazier has served as a director since July 2020, and is currently Virgin Galactic's CEO. As Virgin Galactic's CEO, Colglazier lacks independence to sue his fellow directors, who are in charge of determining his compensation, along with his continued employment with the Company. Indeed, in the Company's proxy statements Colglazier is deemed to be not independent as a Board member.

155.   Defendant Jonas has served as a director since June 2021 and serves as a member of the Audit Committee. As a member of the Audit Committee, Jonas failed in her oversight duties related to the Company's compliance with critical FAA regulations. Austin further pe1mitted the Company to disseminate materially false and misleading statements, including statements in public offering documents, by disloyally concealing material nonpublic information about the Company's operations as detailed above. As a result, she faces a substantial likelihood of liability for breaching her fiduciary duties by acting disloyally and in bad faith for violating her duties of oversight and disclosure, and therefore, demand is futile on Jonas to consider suing the other Defendants for Counts II-V, which arise from the same allegations as her breaches. Indeed, Jonas further exhibited this lack of independence from Branson, Palihapitiya and other directors (including fellow Audit Safety Committee members) when she rejected the resignations offers of directors Bain, Mattson, and Kreeger, who were no longer eligible to be appointed to the Board by Branson and Palihapitiya under the terms of the Stockholders' Agreement.

156.    Defendant Kreeger has served as a director and as Chairperson of the Safety Committee and a member of the Audit Committee since the Merger in October 2019. As a member of the Audit Committee and Chairperson of the Safety Committee, Kreeger failed in his oversight duties related to the Company's compliance with critical FAA regulations. Kreeger further permitted the Company to disseminate materially false and misleading statements, including statements in public offering documents, by disloyally concealing material nonpublic information about the Company's operations as detailed above. As a result, he faces a substantial likelihood of liability for breaching his fiduciary duties by acting disloyally and in bad faith for violating his duties of oversight and disclosure, and therefore, demand is futile on Kreeger to consider suing the other Defendants for Counts II-V, which arise from the same allegations as his breaches.

157.    In addition, Kreeger lacks independence from Branson because he was appointed to the Board by Branson under the terms of the Stockholders' Agreement. Kreeger further lacks independence from Branson because he was responsible for Kreeger's lucrative position as Virgin Atlantic's CEO from February 2013 through December 2018, during which he earned millions of dollars in compensation before his retirement. During that time, Kreeger worked closely with Branson, which included talking to him every few weeks and seeing him face to face every few months. Kreeger and Branson further exchanged e-mails all the time. In fact, Branson knew that Kreeger was retiring from his Virgin Atlantic positions when he decided to appoint him to the Virgin Galactic Board, making Kreeger dependent on Branson for his compensation for nearly a decade now. Indeed, Kreeger's only other source of income is from his Board membership at Mass Luminosity, Inc., a nonpublic company. As such, Kreeger's compensation of approximately $277,500 annually from his Virgin Galactic director position represent material compensation for him. Consequently, Kreeger lacks independence to sue his fellow fiduciaries at Virgin Galactic

because he wants to maintain his income as a Virgin Galactic director. Kreeger also lacks independence to sue Branson and Palihapitiya for engaging insider trading because he also sold Virgin Galactic stock while in possession of the Company's material nonpublic information. Kreeger further lacks independence to sue Austin, Colglazier, Lovell, Jonas, Palihapitiya, and West because they rejected his attempt to resign from the Board after Branson lost his standing to appoint Kreeger to the Board under the Stockholders' Agreement.

158.    Defendant Lovell has served as a director since the Merger in October 2019, and as a member of the Safety Committee. As a member of the Safety Committee, Lovell failed in his oversight duties related to the Company's compliance with critical FAA regulations. Lovell further permitted the Company to disseminate materially false and misleading statements, including statements in public offering documents, by disloyally concealing material nonpublic information about the Company's operations as detailed above. As a result, he faces a substantial likelihood of liability for breaching his fiduciary duties by acting disloyally and in bad faith for violating his duties of oversight and disclosure, and therefore, demand is futile on Lovell to consider suing the other Defendants for Counts II-V, which arise from the same allegations as his breaches.

159.    In addition, Lovell was appointed to the Board by Branson under the terms of the Stockholders' Agreement. Lovell lacks independence from Branson because of longstanding personal and financial ties with Branson's Virgin companies. Branson is responsible for Lovell's current lucrative directorship position, along with a history of employment at his Virgin brands. Specifically, Lovell has: (i) served as a director of Virgin Orbit Holdings, Inc. since March 2017 and has served as its chairman since January 2022; (ii) served as a director Virgin Group Acquisition Corp. II since January 2021; (iii) served as a director of Virgin Group Acquisition Corp. III since February 2021; (iv) been a partner of Virgin Group Holdings Limited and its

affiliates since October 2012 and is responsible for managing the Virgin Group's investment team globally. Additionally, Lovell currently serves on the boards of several of Branson's companies, including Virgin Hotels (2012- present), Virgin Voyages (2014 -present), and BMR Energy (2016-present). Lovell previously served on the board of Virgin America Inc. from 2013 until its acquisition by Alaska Air in 2016. In addition, in 2007, Branson provided seed money to start Virgin Green Fund, which Lovell co-founded. Due to his loyalty to Branson for his lucrative relationships, Lovell is unlikely to take any legal action Branson, or Kreeger, who also worked for other Virgin brand companies. In fact, the Company has admitted that Lovell is not an independent director in its annual Proxy.

160.    Defendant Mattson has served as a director since the Merger in October 2019, and has served as the Chairperson of the Audit Committee. As Chairperson of the Audit Committee, Mattson failed in his oversight duties related to the Company's compliance with critical FAA regulations. Mattson further permitted the Company to disseminate materially false and misleading statements, including statements in public offering documents, by disloyally concealing material nonpublic information about the Company's operations as detailed above. As a result, he faces a substantial likelihood of liability for breaching his fiduciary duties by acting disloyally and in bad faith for violating his duties of oversight and disclosure, and therefore, demand is futile on Mattson to consider suing the other Defendants for Counts II-V, which arise from the same allegations as his breaches.

161.    Mattson also lacks independence from Branson, because he was one of Branson's appointees to the Board under the Stockholders' Agreement. Indeed, Mattson has been dependent on Branson for lucrative financial deals and a steady income. For example, Mattson now serves as a director on Branson's Virgin Orbit. In this regard, Mattson is the co-founder of NextGen I and

NextGen II, SPAC entities, and Branson's Virgin Orbit merged with Mattson's NextGen II through another SPAC transaction in 2021. Pursuant to that transaction Branson enabled Mattson to monetize his investment in NextGen II.  Additionally, Lovell and Mattson both serve on Virgin Orbit's board and multiple boards of Virgin related entities, providing another reason that it unlikely that Mattson will sue Lovell due to their connections with Branson. Mattson further lacks independence to sue Austin, Colglazier, Lovell, Jonas, Palihapitiya, and West because they rejected his attempt to resign from the Board after Branson lost his standing to appoint Mattson to the Board under the Stockholders' Agreement.

162.    Defendant West has served as a director since February 2021, and is a member of the Safety and Audit Committees. Specifically as a members of the Safety Committee and Audit Committees, West failed in his oversight duties related to the Company's compliance with critical FAA regulations. West further permitted the Company to disseminate materially false and misleading statements, including statements in public offering documents, by disloyally concealing material nonpublic information about the Company's operations as detailed above. As a result, he faces a substantial likelihood of liability for breaching his fiduciary duties by acting disloyally and in bad faith for violating his duties of oversight and disclosure, and therefore, demand is futile on West to consider suing the other Defendants for Counts II-V, which arise from the same allegations as his breaches. West further exhibited a lack of independence from Branson, Palihapitiya and other directors (including fellow Safety and Audit Committee members) when he rejected the resignations of directors Bain, Mattson, and Kreeger, who were no longer eligible to be appointed to the Board by Branson and Palihapitiya under the terms of the Stockholders' Agreement.

## C.    FUTILITY AS TO COUNT VI

163.    The Proxy Defendants (*i.e.*, Austin, Bain, Colglazier, Lovell, Jonas, Kreeger, Mattson, Palihapitiya, Ryan, and West) each negligently issued, caused to be issued, and participated in the issuance of the 2021 Proxy Statement as described above. The 2021 Proxy Statement failed to disclose that: (1) the violation of FAA regulations during a July 2021 flight, which resulted in the grounding of the Company's spaceships and the temporary revocation of the Company's commercial flight license; and (2) an undisclosed protracted delay of the launch of the Company's commercial operations because the Company's spaceships needed extensive repairs. '

164.    Virgin Galactic's commercial space flights were not imminent nor did the Company did not have the scale to make the flights a regular occurrence. Nor did Virgin Galactic have critical safety protocols to comply with the FAA's regulations during its flights.

165.    As a result, the Proxy Defendants each face a substantial likelihood of liability for their actions described herein, rendering any demand upon them futile. Because the entire Demand Board consists of directors who are also Proxy Defendants, a demand on the Demand Board related to Count VI would be futile.

## VI.    CAUSES OF ACTION

### COUNT I
### Breaches of Fiduciary Duty
### (Against the Director Defendants)

166.    Plaintiff incorporates by reference and realleges each of the foregoing paragraphs as if fully set forth herein.

167.    Each of the Director Defendants owed and owe fiduciary duties to Virgin Galactic and its stockholders. By reason of their fiduciary relationships, the Director Defendants specifically owed and owe Virgin Galactic the highest obligation of good faith, fair dealing,

loyalty, and due care in the administration and management of the affairs of the Company, including the Company's internal controls, and safety practices.

168.    Each of the Director Defendants consciously and deliberately breached their fiduciary duties of candor, good faith, loyalty, and due care to Virgin Galactic by, *inter alia*, (i) engaging in a course of conduct that violated federal laws and regulations and the Company's policies, and (ii) failing to disclose material adverse information regarding Virgin Galactic's business while insiders and the Company sold over $2 billion of the Company's stock based on that material nonpublic information.

169.    Each of the Director Defendants consciously and deliberately breached their oversight duties to Virgin Galactic by, inter alia, by allowing Virgin Galactic's spaceships to fly in violation of FAA regulations, including § 431.39 and § 431.41.

170.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

171.    Additionally, the Director Defendants have specific fiduciary duties as defined by the Company's corporate governance documents, including the charters of various Board committees that, had they been discharged in accordance with the Director Defendants' obligations, would have necessarily prevented the misconduct and the consequent harm to the Company alleged in this Complaint.

172.    Further, as alleged in detail herein, each of the Director Defendants (and particularly the Director Defendants who served on the Safety and Audit Committees) had a duty to ensure that Virgin Galactic disseminated accurate, truthful, and complete information to its shareholders. The Director Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to Virgin Galactic shareholders

materially misleading and inaccurate information through, *inter alia*, Virgin Galactic's SEC filings and other public statements and disclosures as detailed herein, which failed to disclose the truth about the Company's operations. These actions could not have been a good faith exercise of prudent business judgment.

173.    As a direct and proximate result of the Director Defendants' breaches of their fiduciary obligations, Virgin Galactic has sustained and continues to sustain significant damages including, but not limited to, damages resulting from the securities fraud class action, loss of reputation, loss in market capitalization, and the misuse of the Company's proprietary non-public information by the selling stockholders.

174.    As a result of the misconduct alleged in this Complaint, the Director Defendants are liable to the Company.

**COUNT II**
**Breaches of Fiduciary Duty**
**(Against the Officer Defendants)**

175.    Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth herein.

176.    This Count is brought against the Officer Defendants solely in their capacity as officers of Virgin Galactic.

177.    The Officer Defendants owed and owe fiduciary duties to Virgin Galactic and its stockholders. By reason of this fiduciary relationship, the Officer Defendants specifically owed and owe Virgin Galactic the highest obligation of good faith, fair dealing, loyalty, and due care in the administration and management of the affairs of the Company, including the Company's financial reporting, internal controls, and compensation practices.

178. The Officer Defendants consciously and deliberately breached their fiduciary duties of candor, good faith, and loyalty by, *inter alia*, (i) engaging in a course of conduct that violated the Company's policies; and (ii) failing to disclose to the investing public material adverse information regarding Virgin Galactic's business while insiders and the Company sold approximately $2 billion of the Company's stock based on that material nonpublic information.

179. Each of the Officer Defendants consciously and deliberately breached their oversight duties to Virgin Galactic by, *inter alia*, allowing Virgin Galactic's spaceships to fly in violation of FAA regulations, including § 431.39 and § 431.41.

180. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

181. As a direct and proximate result of the Officer Defendants' breaches of their fiduciary obligations, Virgin Galactic has sustained and continues to sustain significant damages, including, but not limited to, damages resulting from the Securities Action, loss of reputation and market capitalization, and the misuse of the Company's proprietary non-public information by the selling stockholders.

182. As a result of the misconduct alleged in this Complaint, the Officer Defendants are liable to the Company.

### COUNT III
### Breaches of Fiduciary Duty
### (Against Defendants Branson, Kreeger, and Palihapitiya)

183. Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth herein.

184. At all times, Branson was a controlling stockholder of Virgin Galactic, who owed and owes fiduciary duties to Virgin Galactic and its stockholders. By reason of this fiduciary

relationship, Branson specifically owed and owes Virgin Galactic the highest obligation of good faith, fair dealing, loyalty, and due care when taking any actions motivated by the Company's material nonpublic information.

185.    Until he sold all of this Virgin Galactic stock, Palihapitiya was also a controlling stockholder of Virgin Galactic, who owed and owe fiduciary duties to Virgin Galactic and its stockholders. By reason of this fiduciary relationship, Palihapitiya specifically owed and owes Virgin Galactic the highest obligation of good faith, fair dealing, loyalty, and due care when taking any actions motivated by the Company's material nonpublic information

186.    As directors of the Company, Kreeger and Palihapitiya owed and owe fiduciary duties to Virgin Galactic and its stockholders. By reason of these fiduciary relationships, those defendants specifically owed and owe Virgin Galactic the highest obligation of good faith, fair dealing, loyalty, and due care when taking any actions motivated by the Company's material nonpublic information.

187.    By reason of their positions as controlling stockholders and/or directors of the Company, Branson, Palihapitiya, and Kreeger had access to and knew material information regarding Virgin Galactic's business. At the time of the stock sales set forth above, Defendants Branson, Kreeger, and Palihapitiya knew about the material nonpublic information described in this Complaint regarding Virgin Galactic's business operations and sold, or otherwise disposed of, Virgin Galactic's common stock motivated, in part, by that information.

188.    Specifically, that material non-public information concerns, *inter alia*: (1) the destruction of the horizontal stabilizers on one of the Company's spaceships during a February 2019 flight; (2) the violation of FAA regulations during a July 2021 flight, which resulted in the grounding of the Company's spaceships and the temporary revocation of the Company's

commercial flight license; and (3) an undisclosed protracted delay of the launch of the Company's commercial operations because the Company's spaceships needed extensive repairs. The information was a proprietary asset belonging to the Company, which Defendants Branson, Kreeger, and Palihapitiya used improperly for their own benefit and the Company's benefit when they sold over $1.3 billion of Virgin Galactic common stock.

189.     Defendants Branson, Kreeger, and Palihapitiya' s sales of Virgin Galactic common stock, while in possession and control of this material nonpublic information, is a breach of their fiduciary duties of loyalty and good faith.

190.     Because the use of the Company's proprietary information for their own gain and the Company's gain constitutes a breach of the fiduciary duties by Defendants Branson, Kreeger, and Palihapitiya, the Company is entitled to damages.

### COUNT IV
### Unjust Enrichment
### (Against All Defendants)

191.     Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth herein.

192.     By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of Virgin Galactic in the form of, *inter alia*, salaries, bonuses, stock options, and/or other forms of executive compensation.

193.     Plaintiff, as a stockholder and representative of Virgin Galactic, seeks restitution from Defendants and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendants due to their wrongful conduct alleged in this Complaint.

**COUNT V**
**Contribution and Indemnification**
**(Against all Defendants)**

194.    Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth herein.

195.    Virgin Galactic is alleged to be liable to various persons, entities and/or classes by virtue of the same facts or circumstances as are alleged herein that give rise to Defendants' liability to Virgin Galactic, including by way of the Securities Action.

196.    Virgin Galactic's alleged liability on account of the wrongful acts, practices and related misconduct described above arises, in whole or in part, from the knowing, reckless, disloyal and/or bad faith acts or omissions of the Defendants as alleged above, and Virgin Galactic is entitled to contribution and indemnification from each Defendant in connection with all such claims that have been, are or may in the future be asserted against, Virgin Galactic by virtue of the Defendants' misconduct.

**COUNT VI**
**Violation of Section 14(a) of the Securities Exchange Act and SEC Rule 14a-9**
**(Against the Proxy Defendants)**

197.    Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth herein.

198.    SEC Rule 14a-9 (17 C.F.R. § 240.14a-9), promulgated under Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with

respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.[22]

199.    The Proxy Defendants issued, caused to be issued, and participated in the issuance of materially misleading written statements to shareholders which were contained in the 2021 Proxy Statement.

200.    This Proxy Statement contained a proposal to Virgin Galactic shareholders urging them to elect and re-elect members of the Board, among other things. The 2021 Proxy Statement, however, misleadingly suggested that the Board maintained effective risk management and omitted any disclosures regarding how Virgin Galactic: (1) violated FAA regulations during a July 2021 flight, which resulted in the grounding of the Company's spaceships and the temporary revocation of the Company's commercial flight license; and (2) would experience a protracted delay of the launch of the Company's commercial operations because the Company's spaceships needed extensive repairs.

201.    By reason of this conduct, the Proxy Defendants violated Section 14(a) of the Exchange Act. As a direct and proximate result of this wrongful conduct, Virgin Galactic mislead and/or deceived its shareholders by making misleading statements that were an essential link in shareholders heeding Virgin Galactic's recommendation to re-elect and elect the current Board.

202.    The false and misleading information contained in the 2021 Proxy Statement was material to Virgin Galactic's shareholders in determining whether to re-elect and elect the current Board. This information was also material to investors for assessing the integrity of the directors who were proposed for election to the Board. Plaintiff, on behalf of Virgin Galactic, thereby seeks

---

[22] 17 C.F.R. § 240.14a-9(a).

relief for damages inflicted upon the Company based upon the misleading 2021 Proxy Statement in connection with the improper election and reelection of the members of the Board.

203.    This action was timely commenced within three years of the date of the 2021 Proxy Statement and within one year from the time Plaintiff discovered or reasonably could have discovered the facts on which this claim is based.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment as follows:

A.    A determination that this action may be properly pursued as a derivative action and that demand is excused;

B.    Declaring that Defendants, as set forth in the Counts, have breached their fiduciary duties to Virgin Galactic and have been unjustly enriched;

C.    Declaring that the Proxy Defendants violated Section 14(a) of the Exchange Act;

D.    Determining and awarding to Virgin Galactic the damages sustained by it as a result of the violations set forth above from each Defendant, jointly and severally, together with prejudgment and post-judgment interest thereon;

E.    Directing Virgin Galactic to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the damaging events described in this Complaint, including putting forward for a stockholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation, and taking such other actions as may be necessary;

F.    Extraordinary equitable or injunctive relief as permitted by law or equity, including attaching, impounding, imposing a constructive trust on, or otherwise restricting Defendants' assets so as to assure that Plaintiff, on behalf of Virgin Galactic, has an effective remedy;

G.    Awarding to Virgin Galactic restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by Defendants;

H.    Awarding to Plaintiff costs and disbursements related to this action, including reasonable attorneys' fees, consultant and expert fees, costs, and expenses; and

I.    Granting such other and further relief as the Court deems just and proper.

Dated: February 13, 2023

OF COUNSEL:

**MORRIS KANDINOV LLP**
Aaron Morris
Andrew Robertson
Leo Kandinov
1740 Broadway, 15th Floor
New York, NY 10019
(877) 216-1552
aaron@moka.law
andrew@moka.law
leo@moka.law

**COOCH AND TAYLOR P.A.**

*/s/ Andrew A. Ralli*
Blake A. Bennett (# 5133)
Andrew A. Ralli (# 6733)
The Nemours Building
1007 N. Orange Street, Suite 1120
Wilmington, DE 19801
(302) 984-3821
bbennett@coochtaylor.com
aralli@coochtaylor.com

*Attorneys for Plaintiff*